John Milton Hardy was indicted, tried, convicted, and sentenced to death for the robbery-murder of Clarence Nugene Terry, a capital crime defined by § 13A-5-40(a)(2), Ala. Code 1975. He appealed to the Court of Criminal Appeals, which affirmed his conviction and death sentence. Hardy v. State, 804 So.2d 247 (Ala.Crim.App. 1999). He petitioned us for a writ of *Page 300 
certiorari on July 9, 1999, which we granted as a matter of right in compliance with Rule 39, Ala.R.App.P., as it existed before the recent amendments which became effective for death penalty cases on May 19, 2000. We affirm.
The opinion of the Court of Criminal Appeals describes the robbery-murder itself:
 "In the early morning hours of September 7, 1993, Clarence Nugene Terry, the clerk at a Bud's Convenience Store located in Decatur, was murdered and robbed. A surveillance camera captured the entire robbery-murder on videotape, and the videotape was recovered at the scene. The videotape showed that [two men] entered the store and that [one of them] was armed with a gun. Immediately upon entering the store, [the gunman] began shooting at Terry. As [the gunman] fired the initial shot, [his unarmed companion] walked past [the gunman] toward the cash registers. The first shot missed Terry, and he ran behind the counter, trying to hide. [The unarmed companion], by this time also behind the counter, tried to open the cash registers as Terry lay on the floor near [the unarmed companion's] feet. As [the unarmed companion] attempted to open the cash registers, [the gunman], who was still in front of the counter, leaned over the counter and shot Terry in the chest. Terry tried to protect and hide himself after this shot. [The gunman] walked around the counter, and while standing over Terry, fired five shots into Terry's face and head. Forensic evidence showed that Terry was still conscious when [the gunman] began shooting him in the head. Terry suffered gunshot wounds to the left cheek, left upper cheek, center of his forehead, left ear, left eye socket, right side of his chest, and the palm of his right hand. Any of the wounds to the head or the one to the chest would have proved fatal. As Terry lay dying on the floor, [the two intruders] continued their attempts to open the cash registers. [The unarmed intruder], at one point, kicked Terry's foot to move it out of his way. The attempts to open the cash registers were unsuccessful, so [the two intruders] unplugged one of the cash registers and took it with them when they ran out of the store."
804 So.2d at 255. The opinion of the Court of Criminal Appeals continues:
 "The state's evidence further showed that on August 29, 1993, a few days before the robbery-murder, [Ulysses Charles] Sneed and Christopher Hines drove in Hines's blue 1978 Ford automobile from Louisville, Kentucky, to Tanner, Alabama, to visit Hines's relatives. Sometime after arriving in Tanner, Hines introduced Sneed to Hardy. On the evening of September 6, 1993 (the evening before the early-morning crime), Hardy, Sneed, and Hines rode in someone else's automobile to Tennessee to purchase fireworks and beer. They returned to Alabama, where they spent the remainder of the evening drinking. Around 10:30 p.m., Hines let Hardy borrow his automobile; Sneed left with Hardy. Hines did not see either Hardy or Sneed until around 3:00 or 4:00 a.m. the next morning, when he accompanied them to a location near Hardy's father's house, where, using a sledgehammer, the three men attempted to get money out of a cash register. Subsequently, the cash register was identified as the one taken during the robbery-murder, and Hines's fingerprint was later found on a piece of the cash register that was recovered. Sometime later that day Hardy, Sneed, and Hines returned to Hardy's father's house, where Hardy and his father had an argument about a *Page 301 
gun; Hardy's father accused him of stealing the gun.
". . . .
 "On Wednesday, September 8, 1993, [the day after the robbery-murder,] Hardy, Sneed, and Hines traveled to Louisville, Kentucky. Hardy was arrested in Kentucky the same day. At the time of his arrest, he was carrying a 9mm semiautomatic handgun. While in custody in Kentucky, Hardy gave an oral statement to the Decatur, Alabama, officers, denying his involvement in the crime; however, he admitted borrowing Hines's automobile on September 6. Also, when asked how much money he `got,' he replied that he did not get any because he could not get the cash register open. He further stated that he had hidden the gun, wrapped in plastic, in the attic at his father's house in Alabama; that the clothes, presumably those worn during the crime, had been burned; and that the cash register had been thrown away. He stated that when he was returned to Alabama, he would consent to a search and would show the officers where the gun was located.
 "Hardy appeared before a judge [in Kentucky], waived extradition, and was returned to Alabama. Upon arrival at his father's house, Hardy signed a consent-to-search form. The officers did not find the gun. When asked about it, Hardy stated that he did not know what the officers were talking about and that he had told the officers about a gun just so he could return to Alabama. He further stated that he knew nothing about any burned clothes. There was a smoldering fire in the backyard, but the officers could not determine what had been burned."
804 So.2d at 256.
Hardy was tried jointly with Sneed for the capital robbery-murder. Both Hardy and Sneed objected strenuously and persistently to being tried together.
At trial, Hines identified the image of the gunman on the videotape as Hardy. Likewise at trial, Decatur Officer Eric Partridge, Decatur Investigator Thomas Townsend, and the Decatur chief investigator for the case, Dwight Hale, identified the videotape image of the gunman as Hardy.
 "Partridge testified that he [had] known Hardy for 15 years; that they had gone to school together; that they rode the same school bus daily for five or six years; that he [had] also `known him through the police department' (R. 3134), and that, while he was a police officer, he saw Hardy two to three times a week; and that the last time he had seen him before the commission of the September 7, 1993, robbery-murder was around August 20, 1993. Townsend testified that he [had] known Hardy all of Hardy's life; that he knows Hardy's family; that they live in the same community; and that, during the year preceding the capital offense, he saw Hardy an average of three times a week. Hines testified that, when he viewed the videotape several days after the offense, he identified the gunman in the videotape as Hardy. He further testified that he had been with Hardy on several occasions during the days preceding the crime and that he was with Hardy during the hours around the crime except between approximately 10:30 p.m., when he gave Hardy the keys to his automobile, and around 3:00 or 4:00 a.m. the following morning, when Hardy returned; and that after Hardy returned, they were going to go get breakfast, but instead Hardy took him to where the cash register was." *Page 302 
804 So.2d at 271-72. "Hale, the chief investigator for this case, testified that he spent a total of about 15 hours around Hardy after Hardy's apprehension, which included interviewing Hardy in Louisville and transporting him to Alabama." 804 So.2d at 271.
Similarly, at trial, Hines and Hale identified the videotape image of the unarmed intruder as Sneed.
 "Hines testified that he and Sneed were `best friends'; that he had known him seven or eight years; that when they arrived in Alabama, they went places with Hardy; that he saw Sneed several hours before the crime and again several hours after the crime; and that he recognized Sneed in the videotape when he viewed it several days after the crime."
Sneed v. State, 783 So.2d 841, 855 (Ala.Crim.App. 1999).
 "In concluding that Sneed was the unarmed person depicted in the videotape, Hale testified that Sneed gave information at booking that he was 6 feet, 1 inch in height and that he weighed 275 pounds; that Sneed appeared to actually be a little heavier than that; that he spent 3 or more hours with Sneed when he interviewed him in Kentucky within a week of the crime; that he spent additional time with Sneed after Sneed was returned to Alabama; and that after viewing the videotape during the interview in Kentucky, Sneed admitted that he was the participant depicted in the videotape carrying the cash register."
Id., at 855. Moreover, at trial, the State introduced a version of a purported statement by Sneed admitting to being the unarmed robber. The statement had been redacted extensively to eliminate all references to Hardy.
 "Hardy's defense was that he was not present when the crime was committed and that he had no knowledge of it. He attempted, through alibi witnesses, to show that he was at home when the crime was committed, and he presented witnesses who testified that he was not one of the people committing the crime shown in the surveillance camera videotape. Sneed's defense was that he participated in the robbery part of the crime, but not the murder; that he was one of the people in the videotape but not the gunman; and that he did not intend that anyone be killed."
Hardy, 804 So.2d at 260. Neither Hardy nor Sneed testified at trial. The jury rejected both defenses and returned guilty verdicts and death penalty recommendations against both Hardy and Sneed. The trial court sentenced both to death.
Hardy contended at trial and on appeal, and still insists before us, that Sneed's defense was so antagonistic to Hardy's that the trial court's trying the two defendants jointly constituted reversible error. Indeed, although the trial court had ordered Sneed's counsel not to identify Hardy as the gunman, Sneed's counsel's cross-examination of the State's witnesses and Sneed's counsel's closing arguments necessarily implied that Hardy was the gunman. Among numerous statements by Sneed's counsel implying that Hardy was the gunman are the following typical remarks in argument:
 ". . . Charles Sneed is guilty of being with the wrong person at the wrong time, and he's guilty of lying. He went in there to take some money, but the clear uncontroverted evidence is that he never intended for there to be any sort of hurting or killing or maiming or anything. He never intended that. There's absolutely no evidence that my client ever had a weapon, used a weapon, or intended to hurt anybody.
". . . . *Page 303 
 ". . . But sometimes things happen and it makes it even more important and appropriate for you people to make the right decision in this case as to the culpability of either of these defendants, because there's a significant difference in the culpability of these people.
". . . .
 "You also saw that when my client walked in, the other person in the video, the first thing he does is he raises that .22 rifle and points it at the clerk. . . . After the first shot, [the victim] goes and falls down behind the counter and begs for his life, and you know that my client didn't do anything to cause that.
". . . .
 ". . . But the truth of the matter is my client thought they were going to get some money, not harm anybody, not hurt anybody, certainly not kill anybody, and get some money to go buy some more beer.
 "Well when you look at that video, it is obvious that the other person never had that intention whatsoever. He comes in blasting. He comes in there and he fires a shot and he can't even wait. He wants to get over there and shoot him again or shoot at him again when it was totally unnecessary, totally unnecessary.
 "All he had to do was hold that gun, wait for my client to get the money and walk out of there, and nothing would have ever happened. There's a big difference in culpability of those two people.
". . . .
 ". . . Furthermore, the truth of the matter is there's not one scintilla, one iota of evidence to indicate that my client, Charles Sneed, had any idea the other person was going to use that gun for any other purpose other than to scare him.
". . . .
 ". . . The clear uncontroverted evidence is that Charles Sneed was in Kentucky, that he came down here. He didn't know a lot of people down here. He was basically along for the ride. What's he going to do? He opens the door and the first thing that happens is this other person starts blasting. I mean, he has got the gun and if he doesn't do what he's supposed to do then he might get killed or hurt. What's he supposed to do?
". . . .
 "My client is guilty of being with the wrong person at the wrong time and going in and trying to take the money, but he never, ever intended that anybody get hurt. It would be abominable for anybody to find him guilty of capital murder because he was with the wrong person at the wrong time. He was with a liar is who he was with. He was with somebody who lied and somebody who has lied to you.
". . . .
 "I think it's obvious from those questions that I asked, that what Lieutenant Boyd said when he was in Kentucky, who took the gun when they left there, who did it, who disposed of it. It's pretty obvious to me that Charles Sneed — I call him Charles. Charles Sneed was not the one who masterminded this robbery or the murder of it.
". . . .
 ". . . [The judge] is going to tell you that in my case that there is — she's not going to tell you these words but it won't take you long to figure it out. That there is no evidence that Charles Sneed was the triggerman in this case.
". . . .
 "Well, there was one person in that video who intentionally killed somebody. *Page 304 
There's no doubt about that. Make no mistake, I don't profess to tell you who it was because I don't care, but somebody intended to intentionally kill Mr. Terry."
(R. 3590-3623.) (Emphasis added.)
While the arguments of counsel do not constitute evidence and the trial court repeatedly so instructed the jury, these remarks by counsel would necessarily convey to the jurors the impression that they were learning the inside story on the robbery-murder, a bell that no instructions or rulings could unring.
The particular rulings at issue are the trial court's denials of Hardy's timely filed and heard motion for a severance of his trial from Sneed's trial and his several renewals of this motion for severance during the trial. The law establishes two tests for determining whether two defendants' respective defenses are so antagonistic that a joint trial constitutes error. Neither of the two tests identifies reversible error in Hardy's case.
The first test is that "[t]he defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defenses[;]" that is, "severance is required because of mutually antagonistic defenses only when the defenses are so antagonistic that the acceptance of one party's defense will preclude the acquittal of the other." Hill v. State, 481 So.2d 419, 424
and 425 (Ala.Crim.App. 1985) (internal quotation marks omitted). On the one hand, we must disagree with the rationale of the Court of Criminal Appeals that,
 "It is obvious that the defenses are not incompatible or so antagonistic that the acceptance of one party's defense would preclude the acquittal of the other. . . . Hardy has not shown that he could have been acquitted only if Sneed's defense was rejected, nor has he shown that he would have been convicted only if Sneed's defense was accepted. His defense clearly did not depend on Sneed's conviction."
Hardy, 804 So.2d at 260. As a matter of practical psychology and advocacy, the only way for Sneed to persuade the jury to acquit him of capital murder and to convict him of only a lesser included offense on his theory that he was an accomplice only in the robbery, with no intent to kill anyone, was to deflect all of the blame for the capital murder onto the only other party within the jurisdiction of this jury, namely Hardy himself. As a practical matter, as distinguished from a mere theoretical possibility, the jury would not accept Sneed's defense without redressing Terry's murder by convicting Hardy. The jury could hardly acquit Hardy of the capital murder if Sneed successfully deflected all the blame for the capital murder from himself to Hardy. The jury could hardly accept Sneed's defense that Hardy was the gunman and the sole intentional murderer and still accept Hardy's defense that he was not a participant in the crime at all. Thus this first test identifies the defendants' respective defenses as so antagonistic as to require separate trials.
On the other hand, the terms of this very same test coupled with the eventuality that the jury, in fact, disbelieved and rejected Sneed's defense, renders harmless the rulings by the trial court denying Hardy's motion, and his renewals thereof, for a severance. That is, because the jury did not believe Sneed's defense, it did not necessarily preclude the jury from accepting Hardy's defense.
The second test is
 "that an antagonistic defense would present a conflict so prejudicial that [the] defenses are irreconcilable, and the *Page 305 
jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty. . . . It applies only when there is a danger that the jury will unjustifiably infer that this conflict alone
demonstrates that both [defendants] are guilty; it does not apply when independent evidence of each defendant's guilt supports the jury's verdict."
Greathouse v. State, 624 So.2d 202, 205 (Ala.Crim.App. 1992), aff'd,624 So.2d 208 (Ala. 1993) (emphasis added) (citations and internal quotation marks omitted). This second test may be more appropriate than the first test to the dynamics of the particular case before us. That is, while the jury apparently disbelieved the self-serving aspect of Sneed's defense, his denial of complicity in the intentional murder itself, the jury likely inferred from Sneed's defense that Hardy was, in fact, the gunman. The second test, however, does not entitle Hardy to a reversal because, as already quoted, "it does not apply when independent evidence of each defendant's guilt supports the jury's verdict." Id., at 205 (internal quotation marks omitted). In the case before us, superabundant evidence, entirely independent of Sneed's influence on the trial, proves Hardy's guilt of capital robbery-murder. The independent evidence consists of Hardy's own inculpatory statements, Hines's testimony about the prelude to and the aftermath of the robbery-murder, the videotape of the robbery-murder, and the identification of the videotape image of the gunman as Hardy by Hines, Partridge, and Townsend, who were all thoroughly knowledgeable of Hardy's features and appearance before and after the commission of the robbery-murder.
While our analysis of the issue of antagonistic defenses differs in part, as discussed, from the rationale of the Court of Criminal Appeals, we have relied on the authorities cited by that Court and we agree with the result reached by that Court. While trying Hardy jointly with Sneed was judicially risky in this case, it did not prejudice Hardy in the final analysis, and, accordingly, it does not entitle him to relief.
Hardy further claims that he was not validly arrested in Kentucky and that, therefore, the Alabama courts did not acquire jurisdiction to try him. Specifically, Hardy claims that his arrest in Kentucky was illegal because he was not arrested pursuant to a valid fugitive arrest warrant signed by the Governor of the State of Alabama. Therefore, Hardy maintains, his extradition to Alabama was not valid. The evidence, however, shows that Alabama courts properly acquired jurisdiction over Hardy to conduct the proceedings in this case.
The record contains a copy of a warrant for Hardy's arrest for this capital robbery-murder and a supporting affidavit. The affidavit was sworn by Lieutenant Richard H. Crowell of the Decatur, Alabama, Police Department on September 10, 1993, and the warrant was issued by District Judge David J. Breland of Morgan County, Alabama, on September 10, 1993. The arrest warrant is not a fugitive arrest warrant. On September 11, 1993, on this warrant, Hardy was arrested in Kentucky, and he was soon returned to Alabama, where he appeared before Judge Breland at an initial appearance hearing, where Judge Breland advised him of the charge against him. A second arrest warrant was issued on October 25, 1993, after the grand jury had indicted Hardy for capital murder on October 22, 1993. After the indictment was served on Hardy pursuant to this second warrant, he was arraigned on January 6, 1994, in the Morgan County, Alabama, Circuit Court. At the arraignment, the trial judge granted the defense an additional 30 days in which to file "pre-arraignment motions." *Page 306 
On February 4, 1994, Hardy moved to dismiss the indictment against him on the ground that he was "illegally arrested pursuant to an invalid arrest warrant which was served upon [him] in the State of Kentucky, outside the jurisdiction of this Honorable Court." After hearing testimony and arguments, the trial court denied the motion. At the hearing on Hardy's motion to dismiss, Sergeant Mark Fox of the Jefferson County, Kentucky, Police Department testified that he arrested Hardy on September 11, 1993, after Fox received a copy of the warrant issued on September 10, 1993, for Hardy's arrest for allegedly committing the capital offense in Decatur, Alabama. Sergeant Fox testified that he served this arrest warrant on Hardy during this arrest. After Hardy's arrest and during his interrogation in Kentucky by Decatur, Alabama, Detectives Boyd and Hale, Hardy told the detectives that he wanted to return to Alabama. Hale then explained to Hardy that he would have to appear before a Kentucky judge before he could return to Alabama. Hardy testified, at the hearing on his motion to dismiss in the Morgan County, Alabama, Circuit Court, that he appeared before a Kentucky judge and signed a form waiving his right to any extradition proceedings. Hardy testified that he voluntarily signed the extradition waiver because he wanted to return to Alabama.
Even though Sergeant Fox did not arrest Hardy pursuant to a valid fugitive arrest warrant, his arrest of Hardy was valid under Kentucky law, specifically § 440.280, Ky. Rev. Stat. Ann. (Michie 1985), the Kentucky counterpart of Alabama's § 15-9-41, Ala. Code 1975. Section440.280, Ky. Rev. Stat. Ann., provides:
 "The arrest of a person may be lawfully made also by any peace officer or a private person, without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one (1) year, but when so arrested the accused must be taken before a judge with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in the preceding section; and thereafter his answer shall be heard as if he had been arrested on a warrant."
Likewise, § 15-9-41, Ala. Code 1975, provides:
 "The arrest of a person may be lawfully made also by an officer or a private citizen without a warrant upon reasonable information that the accused stands charged with a crime punishable by death or life imprisonment in the courts of another state. When so arrested, the accused must be taken before a district or circuit court judge with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in Section 15-9-40, and thereafter his answer shall be heard as if he had been arrested on a warrant."
The facts in the case before us show that Sergeant Fox, the Kentucky officer, arrested Hardy, although without a Kentucky warrant or a fugitive warrant, upon "reasonable information that [Hardy stood] charged in the courts of [Alabama] with a crime punishable by death or imprisonment for a term exceeding one (1) year." § 440.280, Ky. Rev. Stat. Ann. (Michie 1985). Thus Sergeant Fox's arrest of Hardy was validly authorized by statute. See Ex parte Hamm, 564 So.2d 469 (Ala.),cert. denied, 498 U.S. 1008 (1990); § 440.280, Ky. Rev. Stat. Ann. (Michie 1985), and § 15-9-41, Ala. Code 1975. Further, Hardy's waiver of extradition and voluntary agreement to *Page 307 
return to Alabama operated not only to validate his return to Alabama but also to waive the requirement of the Kentucky statute for a formal complaint and further proceedings in the Kentucky courts. See, e.g.,Williams v. State, 535 So.2d 225, 228 (Ala.Crim.App. 1988); and Davis v.State, 536 So.2d 110, 114-16 (Ala.Crim.App. 1987). Finally, "by [the service of the indictment], the [Alabama] court acquir[ed] jurisdiction of [Hardy's] case." Fields v. State, 121 Ala. 16, 17, 25 So. 726, 726
(1898). See also Ross v. State, 529 So.2d 1074, 1078 (Ala.Crim.App. 1988).
Hardy contends further that the trial court erred in overruling his objections to certain witnesses' identifying the videotape image of the gunman as Hardy. Part V of the opinion of the Court of Criminal Appeals addresses this issue of the circumstances that will justify a witness's identifying a person's image on a videotape. Hardy, 804 So.2d at 268-75. We expressly approve the splendid discussion of this issue by the Court of Criminal Appeals. These rulings by the trial court do not constitute reversible error.
Hardy argues that the prosecutor's jury argument prejudiced Hardy's defense by stating that the prosecutor had signed the indictment and by implying that the Grand Jury had returned the indictment. Hardy contends that the prosecutor's remarks implied that he had special knowledge of the case and a belief in the truth of the indictment itself. Hardy did not object to the prosecutor's remarks to this effect at trial. We agree with the Court of Criminal Appeals to the extent that its rationale is that the trial court's jury instructions limiting the purposes for which the jurors could consider the indictment and the arguments of counsel prevented the prosecutor's remarks from putting the trial court itself into plain error. This Court has recently noted:
 "An improper argument by counsel cannot, in and of itself, constitute an error. See Ex parte Land, 678 So.2d 224 (Ala. 1996); and Ex parte Musgrove, 638 So.2d 1360 (Ala. 1993), cert. denied, Rogers v. Alabama, 513 U.S. 845 (1994). While parties may cause or invite an error, only the court can commit an error. The error, if any, would consist only of incorrectly overruling an objection to an improper argument, incorrectly refusing a requested curative instruction, giving an inadequate curative instruction after a proper request, denying a motion for a mistrial in the case of an ineradicably prejudicial argument, or, in the very rare case, omitting some necessary sua sponte redress for an argument so egregious as to require sua sponte redress by the court even absent an objection with appropriate follow-up by the aggrieved party. The prosecutor's argument in this particular instance does not approach the rare degree of egregiousness that would require sua sponte redress by the court, and the defendant did not interpose any objection to the argument. Thus this issue presents no reversible error. See Rule 45A, Ala.R.App.P.; Kuenzel v. State, 577 So.2d 474
(Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.), aff'd, 502 U.S. 886 (1991); and Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986
(1983)."
Ex parte Burgess, [Ms. 1980803, August 25, 2000] ___ So.2d ___, ___ (Ala. 2000).
On the other hand, we do not agree that such remarks cannot prejudice a defendant. Any suggestion that a grand jury and a prosecutor have adversely judged the defendant's case to the extent of returning and signing an indictment against the defendant cannot improve the jurors' *Page 308 
impartiality or their respect for the defendant's presumption of innocence. While reading the indictment and explaining its function to the jury is a traditional and accepted practice, any statement or intimation that a grand jury returned the indictment or that the district attorney signed it is superfluous and potentially prejudicial. The truth of such a remark neither eliminates the prejudice nor supplies any relevance. A motion in limine to prevent such remarks followed by the remarks themselves, an apt objection by the defense, and an adverse ruling by the trial court could present this Court with an issue of substance in this regard.
The Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy. Likewise, our search of the record reveals no plain error either argued or not argued. Moreover, we agree with the independent assessment by the Court of Criminal Appeals that the death penalty is appropriate in this case.
Accordingly, the judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
HOOPER, C.J., and HOUSTON, COOK, BROWN, and ENGLAND, JJ., concur.
MADDOX, SEE, and LYONS, JJ., concur in the result.