[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 11-10240 & 11-10761

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2012
JOHN LEY
CLERK

D. C. Docket No. 07-cv-01222-IPJ-RRA

JOHN MILTON HARDY,

Petitioner-Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(June 18, 2012)

Before DUBINA, Chief Judge, and TJOFLAT and MARCUS, Circuit Judges.

TJOFLAT, Circuit Judge:

John Milton Hardy is an Alabama prison inmate awaiting execution for a capital murder he committed with Charles Sneed, who likewise is awaiting execution. He has exhausted his state remedies, and a Federal District Court has denied his petition for a writ of habeas corpus. See 28 U.S.C. § 2254. He is here on appeal. His principal claims are that in requiring him to stand trial jointly with Sneed, the Alabama courts denied him due process of law, as guaranteed by the Fourteenth Amendment, and an individualized sentencing proceeding, as guaranteed by the Eighth Amendment. He also argues that the prosecutor commented on his post-Miranda silence in violation of the Fourteenth Amendment. We find no error in the District Courts' denial of the writ, and therefore affirm.

I.

A.

On October 22, 1993, a Morgan County grand jury indicted Hardy and Sneed for the capital offense of murder committed, in the first degree,[1] during the robbery of a convenience store clerk in Decatur, Alabama on September 7, 1993. Prior to trial, Hardy moved the Morgan County Circuit Court for severance on the

_____

[1] See Ala. Code § 13A-5-40(a)(2) (1975).

2

ground that his and Sneed's defenses were "antagonistic to the point of being irreconcilable and mutually exclusive." His defense would be alibi; Sneed's defense would be that Hardy shot the victim. Sneed had given the police a written statement in which he confessed that he and Hardy had robbed the convenience store, but that he did not know, and did not intend, that Hardy would shoot the clerk. The court denied Hardy's motion. As for Sneed's confession, it could address its admissibility at trial.

The joint trial began on September 8, 1995. The Alabama Court of Criminal Appeals, in its opinion affirming Hardy's conviction and death sentence, details the evidence presented to the jury.

> The state's evidence showed the following. In the early morning hours of September 7, 1993, Clarence Nugene Terry, the clerk at a Bud's Convenience Store located in Decatur, was murdered and robbed. A surveillance camera captured the entire robbery–murder on videotape, and the videotape was recovered at the scene. The videotape showed that Hardy and Sneed entered the store and that Hardy was armed with a gun. Immediately upon entering the store, Hardy began shooting at Terry. As Hardy fired the initial shot, Sneed walked past Hardy toward the cash registers. The first shot missed Terry, and he ran behind the counter, trying to hide. Sneed, by this time also behind the counter, tried to open the cash registers as Terry lay on the floor near Sneed's feet. As Sneed attempted to open the cash registers, Hardy, who was still in front of the counter, leaned over the counter and shot Terry in the chest. Terry tried to protect and hide himself after this shot. Hardy walked around the counter, and while standing over Terry, fired five shots into Terry's face and head. Forensic evidence showed that Terry was still conscious when

3

Hardy began shooting him in the head. Terry suffered gunshot wounds to the left cheek, left upper cheek, center of his forehead, left ear, left eye socket, right side of his chest, and the palm of his right hand. Any of the wounds to the head or the one to the chest would have proved fatal. As Terry lay dying on the floor, Sneed and Hardy continued their attempts to open the cash registers. Sneed, at one point, kicked Terry's foot to move it out of his way. The attempts to open the cash registers were unsuccessful, so Hardy and Sneed unplugged one of the cash registers and took it with them when they ran out of the store.

The state's evidence further showed that on August 29, 1993, a few days before the robbery-murder, Sneed and Christopher Hines drove in Hines's blue 1978 Ford automobile from Louisville, Kentucky, to Tanner, Alabama, to visit Hines's relatives. Sometime after arriving in Tanner, Hines introduced Sneed to Hardy. On the evening of September 6, 1993 (the evening before the early-morning crime), Hardy, Sneed, and Hines rode in someone else's automobile to Tennessee to purchase fireworks and beer. They returned to Alabama, where they spent the remainder of the evening drinking. Around 10:30 p.m., Hines let Hardy borrow his automobile; Sneed left with Hardy. Hines did not see either Hardy or Sneed until around 3:00 or 4:00 a.m. the next morning, when he accompanied them to a location near Hardy's father's house, where, using a sledgehammer, the three men attempted to get money out of a cash register. Subsequently, the cash register was identified as the one taken during the robbery-murder, and Hines's fingerprint was later found on a piece of the cash register that was recovered. Sometime later that day Hardy, Sneed, and Hines returned to Hardy's father's house, where Hardy and his father had an argument about a gun; Hardy's father accused him of stealing the gun.

The state's evidence also showed that police officers showed the surveillance videotape of the robbery-murder to several persons, including Hines, in an effort to identify the gunman and his accomplice. Hines and three others positively identified Hardy as the

4

shooter.  Sneed was identified as the accomplice appearing on the videotape.

On Wednesday, September 8, 1993, Hardy, Sneed, and Hines traveled to Louisville, Kentucky.  Hardy was arrested in Kentucky the same day.  At the time of his arrest, he was carrying a 9mm semiautomatic handgun.  While in custody in Kentucky, Hardy gave an oral statement to the Decatur, Alabama officers, [Sergeants Dwight Hale and John Boyd,] denying his involvement in the crime; however, he admitted borrowing Hines's automobile on September 6.  Also, when asked how much money he "got," he replied that he did not get any because he could not get the cash register open.  He further stated the he had hidden the gun, wrapped in plastic, in the attic at his father's house in Alabama; that the clothes, presumably those worn during the crime, had been burned; and that the cash register had been thrown away.  He stated that when he was returned to Alabama, he would consent to a search and would show the officers where the gun was located.

Hardy v. State, 804 So. 2d 247, 255–56 (Ala. Crim. App. 1999).

At some point as it was presenting its case in chief, the State informed the court out of the jury's presence that it intended to introduce the written statement Sneed had given the police.  Hardy objected because the statement implicated him by name.  The court overruled the objection after the State produced a redacted statement that omitted all references to Hardy.  See Ex parte Sneed, 783 So.2d 863, 865 (Ala. 2000) ("[I]n places where Sneed had actually said 'we' or 'he,' the prosecution had substituted 'I[.]'")[2]

---

[2] Sneed's redacted statement read, in pertinent part:

After the State rested, the court asked defense counsel whether they intended to put on any evidence. Hardy's counsel informed the court that Hardy would present a defense, but would not be taking the stand. Sneed's counsel had nothing to present.

---

[Chris Hines and I] arrived [in Alabama] on Sunday, August 29, 1993, at about 3:30 p.m., central time, Alabama time. We drove to Ms. Tina Gill's place. That is where we planned to stay because Chris' mother did not want Chris to stay with his daddy in Alabama because he was a bad influence. While we were there, we went to A & M College, Huntsville into the Ebony club in Triana. We went back Saturday night, but we did not have any trouble. On labor day, we stayed around Ms. Gill's house. Chris was asked if his car could be used to make a liquor run. A case of beer was bought at the county line. I got wasted on beer. I rode around. I remember I rode on a lot of dirt roads. I remember crossing a draw bridge over a river. After crossing the bridge, I went past a lot of gas stations. I remember, I went by about 6. Most of them had several people there. Sometime between 12:00 midnight and 12:30 a.m., I saw a station that had only one guy in it. I went around the block twice. I went by the front of the store and I saw the store clerk in the back by the pop machines. I mean by the place where you open the doors to get the pop out. The car was parked on the side of the store. I used the sleeves from a shirt for a mask to cover my face. When I went by the front of the store the second time, I got out and walked to the front door. I tied the mask on my face and I went in the store. I opened the door and the next thing I knew, the shooting started. I ran and tried to raise up the counter so I could get behind it, but I could not get it up. I crawled under it. I was trying to get the cash register open. There were two cash registers but I could not get either one of them to open. One of the cash registers, I picked up and ran out of the store and got in Chris' car which is a blue colored Ford LTD, 4 door. I am not sure about the model but I think it is a 74. All I know for sure is that it is a 70's model. I went back to Tanner and then I drove Chris' car back to Ms. Gill's house. I poured gas on my clothes and burned them. I went and got the cash register, busted it open, me and Chris, but I never told Chris where I had gotten the cash register or how I got it. I could not get the money drawer open and I had to shake it to get the money out. I remember, I got $48.00. Chris helped get the money out. We spent it all that night on beer and gas. All this happened on Tuesday, the day after labor day. On Wednesday morning, about 9:00 a.m., we left going back to Louisville, me and Chris. I never told Chris what happened and he never asked me.

6

Hardy's defense consisted of the testimony of "two alibi witnesses: his brother, who testified that Hardy was home on the night of the crime and that it was not Hardy on the videotape; and his sister, who also testified that it was not Hardy on the videotape." Hardy v. State, 804 So. 2d at 256.

The jury found both defendants guilty, and following a recess, the sentencing phase of the jury trial began. Before the State presented its case, the court instructed the jury that it was in effect conducting two sentencing proceedings; it had to give separate consideration to the case of each defendant and realize that any evidence admitted against only one defendant should not be considered as to the other defendant. The State went first. It relied on the evidence produced during the guilt phase of the trial and presented, in addition, an unredacted version of Sneed's statement of confession. After the State rested, Hardy presented his case, calling several character witnesses in mitigation, but he did not take the stand. Sneed, in his case, called character witnesses in mitigation but did not testify.

On October 30, 1995, after deliberating, the jury, by a vote of 10 to 2, recommended a death sentence in both cases. On December 21, 1995, the court accepted the jury's recommendation for both defendants and sentenced them to death.

B.

Hardy appealed his conviction and sentence to the Alabama Court of Criminal Appeals. His brief presented several grounds for the reversal of his conviction and death sentence, including the three grounds presented in the instant appeal: (1) "that the 'joinder of [his] trial with his codefendant's violated [his constitutional] rights, and the trial court's refusal to grant a severance was reversible error," Hardy v. State, 804 So. 2d at 257; (2) "that the trial court denied his constitutional right to an individualized sentencing by refusing to sever his penalty phase hearing from that of Sneed," id. at 263; and (3) "that the trial court erred by allowing a state witness[, Sergeant Dwight Hale,] to impermissibly comment on [his] post-Miranda silence," id. at 264. The Court of Criminal Appeals affirmed his conviction and sentence, id. at 298, the Alabama Supreme Court affirmed as well, Ex parte Hardy, 804 So. 2d 298, 308 (Ala. 2000) and the United States Supreme Court denied certiorari review, Hardy v. Alabama, 534 U.S. 1043, 122 S. Ct. 621, 151 L. Ed. 2d 543 (2001).[3]

---

[3] In Ex parte Sneed, 783 So. 2d 863, 870–71 (Ala. 2000), the Alabama Supreme Court reversed the Court of Appeals' affirmance of Sneed's conviction and death sentence and remanded the case for a new trial on the ground that

Sneed's jury would have had to conclude that the edited and redacted version of his statement admitted at trial was untruthful in order to accept his defense that he lacked the specific intent to commit murder. In this respect, Sneed's rights were sacrificed in order to accommodate the State's interest in conducting a joint trial.

8

II.

His state remedies having been exhausted, Hardy repaired to the United States District Court for the Northern District of Alabama, filing a petition for a writ of habeas corpus on June 28, 2007. His petition presented eighteen grounds for relief, including the three presented to the state appellate courts as set out above. The District Court found no merit in any of these grounds and denied relief. Hardy appealed, and the District Court issued a Certificate of Appealability ("COA") designating three issues for appeal: (1) whether the joinder of Hardy's trial with Sneed's violated Hardy's "federal constitutional rights"; (2) whether the joinder of the sentencing phase of Hardy's trial with Sneed's violated his "federal constitutional rights," and (3) whether the Alabama appellate court's conclusions that Hardy's right against self-incrimination was not violated by the prosecutor's comments was "an impermissible application of United States Supreme Court law."[4]

---

Sneed was retried and again found guilty of robbery--murder and sentenced to death. His conviction and sentence were affirmed. Sneed v. State, 1 So. 3d 104, 144 (Ala. Crim. App. 2008).

[4] 28 U.S.C. § 2253 provides, in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
      (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a

9

III.

The federal habeas corpus statute, 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and as

interpreted by the United States Supreme Court, limits the power of a federal court

to grant a writ of habeas corpus vacating the conviction of a state prisoner on the

ground that the conviction was obtained in violation of the Constitution of the

United States. First, a writ may not issue unless, with certain exceptions, the

prisoner has exhausted his state remedies. 28 U.S.C. § 2254(b)–(c); Cullen v.

Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1398, 179 L .Ed. 2d 557 (2011). The

prisoner exhausts his state remedies by presenting his constitutional claim to the

State courts, to afford them an opportunity to correct any error that may have

occurred. Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d

865 (1995) (per curiam). If the prisoner has done this, and the State courts

"adjudicated" his claim "on the merits," the writ

---

State court . . . .
    (2) A certificate of appealability may issue under paragraph (1)
only if the applicant has made a substantial showing of the denial
of a constitutional right.
    (3) The certificate of appealability under paragraph (1) shall
indicate which specific issue or issues satisfy the showing required
by paragraph (2).

28 U.S.C. § 2253(c).

shall not be granted . . . unless the adjudication . . .

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The statutory phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta," of the Supreme Court decisions extant at the time of the State court adjudication. Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). A State court decision is "contrary to" a Supreme Court holding "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412–13, 120 S. Ct. at 1523.[5] A State court decision involves an unreasonable application of a Supreme Court holding if the State court

---

[5] "[W]hen no Supreme Court precedent is on point, . . . a state court's conclusion cannot be 'contrary to clearly established Federal law' . . . ." Dombrowski v. Mingo, 543 F.3d 1270, 1274 (11th Cir. 2008) (quoting Washington v. Crosby, 324 F.3d 1263, 1265 (11th Cir. 2003)).

11

correctly identifies the holding but unreasonably applies it to the facts of the prisoner's case. Id. at 407, 120 S. Ct. at 1520.

An unreasonable application of a Supreme Court holding is different from an incorrect application of a Supreme Court holding. Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011) (quoting Williams, 529 U.S. at 410, 120 S. Ct. at 1522). A federal habeas court might consider the State court's application of a Supreme Court holding incorrect were it reviewing the State court's decision as an appellate court would on direct appeal. But the habeas court is not conducting such review. AEDPA, having limited the court's authority to grant the writ, precludes the court from issuing the writ even when it "concludes in its independent judgment that the state-court decision applied [the Supreme Court holding] incorrectly." Woodford v. Visciotti, 537 U.S. 19, 24–25, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002). "[T]he purpose of AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." Greene v. Fisher, ___ U.S. ___, ___, 132 S. Ct. 38, 43, 181 L. Ed. 2d 336 (2011) (quoting Harrington, ___ U.S. at ___, 131 S. Ct. at 786) (internal quotation marks omitted).

Section 2254(d)'s "standard for evaluating state-court rulings" is therefore "highly deferential," Woodford, 537 U.S. at 24, 123 S. Ct. at 360 (internal

quotation marks omitted), and "difficult to meet," Harrington, ___ U.S. at ___, 131 S. Ct. at 786; it "demands that state-court decisions be given the benefit of the doubt," Woodford, 537 U.S. at 24, 123 S. Ct. at 360.[6] To obtain habeas relief, a state prisoner must show that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents"—"that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at ____, 131 S. Ct. at 786.

These are the principles the District Court employed in considering the claims at issue in this appeal. We employ the same principles, today, in reviewing the District Court's disposition of those claims. The District Court ruled on a cold record, the record compiled in the Alabama courts. We rule on the same cold record, meaning that we afford the District Court's judgment no deference. See Jamerson v. Sec'y for the Dep't of Corr., 410 F.3d 682, 687 (11th Cir. 2005) (stating that we review a district court's denial of a habeas petition de novo). Our

_____

[6] The extent of deference accorded a State court's decision will depend, in part, on the specificity of the Supreme Court holding the State court applied. If the holding is specific, the range of reasonableness may be narrow. If the holding is general, the range of reasonableness may be broad. Yarrough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004).

13

task, as the District Court's was, is to determine whether the petitioner, Hardy, has satisfied the burden ADEPA places on state prisoners seeking § 2254 relief. We turn now to the issues certified in the COA, taking them up in order.

A.

We first discuss whether the joinder of Hardy's trial with Sneed's violated Hardy's "federal constitutional rights."

1.

Rule 13.3 of the Alabama Rules of Criminal Procedure provides that "[t]wo or more defendants may be charged in the same indictment, information, or complaint . . . [i]f they are alleged to have participated in the same act or transaction."[7] Ala. R. Crim. P. 13.3(b). Hardy and Sneed were charged in the same indictment because they participated in the same act, the robbery–murder of Clarence Nugene Terry on September 7, 1993. Prior to trial, Hardy moved the trial court for a severance pursuant to Alabama Rule of Criminal Procedure 13.4(a) on the ground that his and Sneed's defenses were so irreconcilable and mutually

---

[7] Rule 13.3 is based on Federal Rule of Criminal Procedure 8(b), which provides, in relevant part, that "[t]he indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction . . . constituting an offense." Fed. R. Crim. P. 8(b). Hardy renewed his motion for severance during trial and, after the parties rested at the end of the guilt phase of the trial, he moved the court to grant a mistrial.

exclusive that a joint trial would inexorably prejudice him.[8]   His defense was that

he did not participate in the Terry murder; he was at home when the crime

occurred.  Severance was required, he argued, because the jury's "acceptance of

Mr. Sneed's defense, that he and Mr. Hardy participated in a robbery but that Mr.

Sneed did not have any intent to kill, precluded acceptance of . . . Hardy's alibi

defense."  Brief of Appellant at 14, Ex parte Hardy, 804 So. 2d 298 (Ala. 2000)

(No. 95-0589).[9]  "If the jury accepted Mr. Sneed's account of the crime, that he

and John Hardy robbed the store clerk and Mr. Hardy killed the clerk, the jury had

to reject Mr. Hardy's alibi defense."  Id.  The court denied his motion.

In appealing his conviction and sentence, Hardy argued in his opening

briefs to the Alabama Court of Criminal Appeals and, subsequently, to the

---

[8]  Rule 13.4(a), Relief From Prejudicial Joinder, states, in relevant part: "If it appears that a defendant or the state is prejudiced by a joinder . . . of defendants in an indictment . . . or by such joinder for trial together, the court may . . . grant a severance of defendants, or provide whatever other relief justice requires."  Ala. R. Crim. P. 13.4(a).  The rule is modeled after Federal Rule of Criminal Procedure 14(a), Relief From Prejudicial Joinder, which states, in relevant part: "If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).

[9]  Our citations to Hardy's state appeal briefs are to his brief to the Alabama Supreme Court.  On the three issues before us, Hardy's brief to the Alabama Supreme Court essentially mirrored the brief Hardy submitted to the Court of Criminal Appeals.  With respect to the joint trial issue, Hardy's brief cited no Supreme Court case holding, as a matter of law, that requiring two defendants to stand trial together on an indictment charging them with capital murder offended the United States Constitution.  We are aware of none.

15

Alabama Supreme Court, that the trial court "abused its discretion in refusing to sever [his] trial from . . . Sneed's" and that this "error violated [his] rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." Id. at 15. According to Hardy, the trial court should have recognized from the outset that its refusal to hold separate trials would deny him the fair trial guaranteed him (and Sneed) by the Fourteenth Amendment. And that, he says, is what actually happened; he was denied a fair trial. This is the essence of the argument he made.[10]

Hardy cited one United States Supreme Court decision, Zafiro v. United States, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993), in support of his argument that severance was required in order to avoid the denial of a fair trial.[11]

---

[10] Hardy's brief to the Alabama Supreme Court was replete with the words "fair trial." Although the brief did not specifically cite the Due Process Clause of the Fourteenth Amendment or use the words "due process," Hardy's argument, stripped to its essence, was that he was denied a fair trial and thus due process of law. "A fair trial . . . is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955).

If the joinder issue stated in the COA does not embrace the issue of whether the Alabama Supreme Court should have vacated Hardy's conviction because he had been denied a fair trial, we consider the COA amended to include that issue.

[11] Hardy's brief cited two other Supreme Court cases, Zant v. Stephens, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983), and Dawson v. Delaware, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992), to buttress his severance argument. Neither case addresses the COA joinder issue. They were cited following this statement in Hardy's brief:

Mr. Sneed's attorney elicited prejudicial testimony about Mr. Hardy's affiliations, that he had been involved with law enforcement before, and that he had some history of violence. Mr. Sneed's lawyer told the jury that Mr. Hardy was a liar. If

16

In <u>Zafiro</u>, the Supreme Court granted certiorari to "consider whether Rule 14 [of the Federal Rules of Criminal Procedure] requires severance as a matter of law when codefendants present 'mutually antagonistic defenses.'" <u>Id.</u> at 535, 113 S. Ct. at 936; <u>see</u> <u>supra</u> note 8. The petitioners, who had been convicted of conspiring, in violation of 21 U.S.C. § 846, to possess cocaine, heroin and marijuana with intent to distribute, urged the Court to "adopt a bright-line rule, mandating severance whenever codefendants have conflicting defenses." <u>Id.</u> at 538, 113 S. Ct. at 937–38. The Court declined to adopt such a rule. The Court held to the contrary, that "[m]utually antagonistic defenses are not prejudicial <u>per</u> <u>se</u>. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." <u>Id.</u> at 538-39, 113 S. Ct. at 938.

According to the Alabama Court of Criminal Appeals,

---

the prosecution had attempted to introduce this evidence; that attempt would have been error.

Brief of Appellant at 14–15, <u>Ex parte Hardy</u>, 804 So. 2d 298 (Ala. 2000) (No. 95-0589). The parenthetical phrase following the <u>Zant v. Stephens</u> citation is, "(holding 'factors that are constitutionally impermissible or totally irrelevant to the [capital] sentencing process [include] . . . the race, religion, or political affiliation of the defendant . . . .')." <u>Id.</u> The parenthetical phrase following the <u>Dawson v. Delaware</u> citation is, "(defendant's membership in a white separatist prison gang was irrelevant and inadmissible evidence in a capital trial)." <u>Id.</u>

[w]eighing against severance is a preference for joint trials where joint crimes are involved. The United States Supreme Court stated the policy in Richardson v. Marsh as follows:

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Hardy v. State, 804 So. 2d 247, 257–58 (Ala. Crim. App. 1999) (citations omitted) (quoting Richardson v. Marsh, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)) (citing Zafiro v. United States, 506 U.S. 534, 113 S. Ct. 933). The Alabama Supreme Court agreed with this resolution of the joint trial issue. Although it did not cite Zafiro, the Court of Criminal Appeals did so explicitly[12] and the Supreme Court "relied on the authorities [it] cited." Ex parte Hardy, 804 So. 2d 298, 305 (Ala. 2000).

---

[12]  See Hardy v. State, 804 So. 2d 247, 257–259 (Ala. Crim. App. 1999) (citing Zafiro, 506 U.S. 534, 113 S. Ct. 933).

18

The Alabama Supreme Court, however, did not deny Hardy's severance claim because public policy favors joint trials or the trial judge acted within his discretion when he denied Hardy's pretrial motion for severance; rather, the Court addressed Hardy's true federal claim, that he did not receive a fair trial as guaranteed by the Fourteenth Amendment because Sneed's defense was antagonistic to his own and Sneed's counsel acted as a de facto second prosecutor. The Court denied the claim because, at the end of the day, the joint trial did not operate to deny Hardy a fair trial. The evidence of guilt was overwhelming. The Court found that

> superabundant evidence, entirely independent of Sneed's influence on the trial, prove[d] Hardy's guilt of capital robbery–murder. The independent evidence consist[ed] of Hardy's own inculpatory statements, Hines's testimony about the prelude to and the aftermath of the robbery-murder, the videotape of the robbery–murder, and the identification of the videotape image of the gunman as Hardy by Hines, Partridge, and Townsend, who were all thoroughly knowledgeable of Hardy's features and appearance before and after the commission of the robbery–murder.

Id. Moreover, the same overwhelming evidence listed above would have been admitted against Hardy had he been tried separately. The joint trial, while "judicially risky, . . . did not prejudice Hardy in the final analysis." Id. In other words, the Alabama Supreme Court held that Hardy received a fair trial as required by the Fourteenth Amendment.

19

2.

In his brief to the District Court, Hardy did not explain how the Alabama Supreme Court's decision rejecting his "severance" claim was "contrary to, or involved an unreasonable application of," a United States Supreme Court holding, namely Zafiro v. United States. Specifically, he did not explain how the holding in Zafiro—that Rule 14 does not require pretrial severance where the defendants' defenses are "mutually antagonistic"—required the Alabama Supreme Court to vacate his conviction and remand the case for a new trial. As a consequence, the District Court dismissed his claim.

3.

Hardy has done no better in this court. He has not explained why we should not defer to the Alabama Supreme Court's decision for a reason provided in 28 U.S.C. § 2254(d)(1) and (2). Nor does he indicate Zafiro's significance. This is not surprising because Zafiro is a Federal Rule of Criminal Procedure case, not a case announcing a principle of constitutional law.[13] See Collins v. Runnels, 603

---

[13] The Zafiro petitioners, in their opening brief to the Supreme Court, stated that the "case concern[ed] the constitutionally secured right to due process of law under Amend. V." Brief for the Petitioners at 1, Zafiro v. United States, 506 U.S. 534, 113 S. Ct. 933, 122 L.Ed. 2d 317 (1993) (No. 91-6824). The Court did not explicitly mention the Fifth Amendment's Due Process Clause in interpreting Federal Rule of Criminal Procedure 14. Arguably, however, the Court implicitly held that mutually antagonistic defenses also do not per se violate the due process right to a fair trial; such a holding would not aid Hardy's case.

20

F.3d 1127, 1132 (9th Cir. 2010) ("Zafiro only applies to federal and not state court trials."); Phillips v. Million, 374 F.3d 395, 398 (6th Cir. 2004) ("Zafiro involved the interpretation of Federal Rules of Criminal Procedure 8, 14, and 18, not the United States Constitution."). Therefore, Zafiro was not binding on the Alabama Supreme Court, and Hardy's claim must instead rest on the Fourteenth Amendment's right to a fair trial. See Phillips, 374 F.3d at 398 ("Zafiro thus has no precedential weight in reviewing state court proceedings on due process grounds[.]").

Zafiro, though not a constitutional case, does inform our response to Hardy's argument that he was denied a fair trial. Principally, Hardy argued that he was denied a fair trial because, if tried alone, he would not have been subjected to an additional prosecutor, Sneed's lawyer. As he stated in his brief to the Alabama Supreme Court, Sneed's lawyer served as "a second private prosecutor." Brief of Appellant at 6, Ex Parte Hardy, 804 So. 2d 298 (Ala. 2000) (No. 95-0589); see also id. at 17 ("John Hardy fought for his life on two fronts: the state and the codefendant's attorney acting as private prosecutor."); id. at 18 (Sneed's lawyer "was permitted to prejudice Mr. Hardy in ways that the state would not have been permitted to do."). The Zafiro Court acknowledged that, under some circumstances, a joint trial "might present a risk of prejudice" sufficient to warrant

21

severance under Rule 14. Zafiro, 506 U.S. at 539, 113 S. Ct. at 938. The second-prosecutor, finger-pointing situation Hardy complains of is not one of those circumstances the Court identified. See id. Further, the Court stated that, in Zafiro, proper jury "instructions sufficed to cure any possibility of prejudice" that resulted from the co-defendant's opening and closing arguments. 506 U.S. at 541, 113 S. Ct. at 939; cf. United States v. Blankenship, 382 F. 3d 1110, 1126 (11th Cir. 2004) (holding that although the entire thrust of a codefendant's defense was to blame the other defendants, any prejudice was cured by a jury instruction that counsel's slanderous arguments were not evidence).

The specific circumstances of Hardy's case further bolster our conclusion that Hardy's joint trial was not unfair. First, the trial court admonished the jury on several occasions that arguments and statements of counsel were not evidence and were not to be treated as such. Second, the video tape captured everything that took place during the course of the robbery-murder and clearly showed that Hardy, not Sneed, shot the victim. Third, whatever Sneed's lawyer said or implied (as to which defendant shot the victim) in his cross-examination of the State's witnesses and in his argument to the jury, the prosecutor brought out in his examination of the witnesses and emphatically pointed out to the jury in closing argument.

Finally, it was obvious to everyone in the courtroom that Hardy did the shooting while Sneed was busy trying to open the cash registers.

In sum, Hardy has not carried his AEDPA obligation of establishing that the Alabama Supreme Court's decision, that he failed to show that he was denied a fair trial, was contrary to or an unreasonable application of clearly established federal law. We therefore affirm the District Court's resolution of the first issue designated in the COA.

B.

We will consider next whether joinder of the sentencing phase of Hardy's trial with Sneed's violated his "federal constitutional rights."

In part II of his briefs to the Alabama Court of Criminal Appeals and Alabama Supreme Court, Hardy challenged the trial court's handling of the sentencing phase of his case under this heading: "Consolidating Mr. Hardy's and his Co-defendant's Capital Penalty Phase Trials Denied Mr. Hardy his Right to Individualized Sentencing." Brief of Appellant at 18, Ex Parte Hardy, 804 So. 2d 298 (Ala. 2000) (No. 95-0589). Hardy argued that "joint penalty phase procedure . . . violated [his] constitutionally guaranteed rights to due process, a fair trial, and a reliable sentence under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, under the Alabama Constitution of 1901, and under

23

Alabama law." Id. The Sixth Amendment contains several rights,[14] but Hardy's brief cited none that were violated. Nor did the brief cite any United States Supreme Court Sixth Amendment holdings that the Court of Criminal Appeals was supposed to address. This no doubt explains why the Court of Criminal Appeals, in addressing the "joint penalty phase procedure" argument said nothing at all about a Sixth Amendment claim.[15]

---

[14] The Sixth Amendment provides that

[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

The Supreme Court has applied the Sixth Amendment's protections to the States through the Due Process Clause of the Fourteenth Amendment. See, e.g. Pointer v. Texas, 380 U.S. 400, 407, 85 S. Ct. 1065, 1070, 13 L. Ed. 2d 923 (1965) (holding that Sixth Amendment right to confront adverse witnesses extends to states through Fourteenth Amendment); Gideon v. Wainwright, 372 U.S. 335, 342–43, 83 S. Ct. 792, 796, 9 L. Ed. 2d 799 (1963) (holding that the Fourteenth Amendment makes the Sixth Amendment's guarantee of the right to counsel obligatory upon the States).

[15] In the habeas petition he filed in the District Court, Hardy did not assert that the "joint penalty phase procedure" denied him a Sixth Amendment right. He asserted a specific Sixth Amendment claim for the first time in his brief to this court. He argues that he was denied his rights under the Sixth Amendment's Confrontation Clause and the Fifth Amendment and that "[t]he state courts failed to address either the Sixth Amendment Confrontation Clause or due process problems posed by the penalty-phase admission of Sneed's confession, which facially incriminated Mr. Hardy. Thus, the federal habeas courts must review those aspects of the claim de novo." Brief of Appellant at 28, Hardy v. Allen, No. 11-10240 (11th Cir. Mar. 7, 2011).

Part II of Hardy's brief focused on a capital defendant's Eighth Amendment right to individualized sentencing.[16] The Court of Criminal Appeals recited Hardy's claim thus:

> Hardy contends that the trial court denied his constitutional right to an individualized sentencing by refusing to sever his penalty phase hearing from that of Sneed. The basis of this contention is essentially that, under the circumstances, the jury would be unable to give separate, personal consideration to the sentence of each defendant and unable to base the sentence on each defendant's own acts, statements, and the evidence applicable to him. He argues that the risk of prejudice by this joinder was too great to have been alleviated by jury instructions.

Hardy, 804 So. 2d at 263.

After stating that, in capital cases, Alabama law required the guilt and penalty phases of the defendant's trial to be held before the same jury, except in certain situations not present in the case, and that "the same policy considerations that favor joint trials in the guilt phase also apply in the sentencing phase," id., the Court of Criminal Appeals—citing Richardson v. Marsh, 481 U.S. 200, 107 S. Ct. 1702, and Lockhart v. McCree, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137

---

[16] This right is enforceable against the States through the Fourteenth Amendment's Due Process Clause. See e.g., Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964–65, 57 L. Ed. 2d 973 (1978) (holding that Ohio violated the Eighth and Fourteenth Amendments when it sentenced a defendant to death pursuant to a statute that required the sentencer to impose a death sentence absent three specific circumstances.). We assume that the citations of the Eighth and Fourteenth Amendments meant that Hardy was deprived of a right secured by the Supreme Court's Eighth Amendment holdings.

(1986)—rejected Hardy's argument that the Federal Constitution forbade a joint trial of the penalty phase of a capital case, Hardy, 804 So. 2d at 263–64. The court turned, then, to the question of whether Hardy had been denied an individualized sentencing determination.

The court began with a statement of what the Eighth Amendment required and explained why Hardy was afforded that requirement.

> The Eighth Amendment requires an individualized sentencing determination in death penalty cases. The record does not support Hardy's claim that a joint sentencing hearing in this case made it impossible for the jury in this instance to render this required individualized sentencing decision as to each defendant. This was not a case in which there was considerably more aggravating evidence against one defendant than against the other. Both defendants had been indicted and convicted of the same robbery-murder. The evidence of aggravating circumstances that the state presented at the sentencing hearing was identical as to each defendant. In addition, each defendant presented mitigating evidence relevant to his character and record. Hardy's sister, Norma Jean Newton, testified at the sentencing phase before the jury that Hardy was 21 years of age when the crime was committed; that he was well liked, helpful, did not have a reputation for violence, had never committed a violent crime before this offense; and that the crime for which he was convicted was "out of character" for him. Frank D. Travis, a church youth director who became acquainted with Hardy when he was counseling other youth in the Hardy home, testified that Hardy was a "nice kid"; that he encouraged other kids to do the "right thing"; and that he was "peaceable" and not a troublemaker. David Burleson III, one of Hardy's former teachers, testified he was shocked to hear that Hardy had committed such a crime. Joe Willie Johnson, a friend and former classmate of Hardy's, testified that Hardy had a good reputation for peaceableness. Lorraine Newton Hardy, his

mother, testified that he was a "good boy" and that she could not believe that he had committed the crime charged, and she recommended that his punishment be life imprisonment.

Id. at 263 (citations omitted) (citing Stringer v. Black, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992) and Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)).

After reciting the evidence the State presented in aggravation and what Hardy presented in mitigation, the court reviewed the trial court's jury instructions and counsel's arguments to the jury to determine whether the defendants had been treated separately and given individual sentencing consideration.

> Before, during, and after closing arguments, the trial court specifically instructed the jury to give separate consideration to each defendant. The jury was informed on each occasion that each defendant was entitled to have his sentence decided on the evidence and law applicable to him and that any evidence that was limited to one defendant should not be considered as to the other defendant. In addition, counsel for the defendants, as well as the prosecutor, in their closing arguments, reiterated and emphasized the instructions of the trial court in this regard. After closing arguments in the sentencing phase, the trial court instructed the jury as follows:
>
>> You have heard two separate sentencing hearings that were presented at the same time. As you listen to these instructions and as you deliberate, it is your duty to give separate personal consideration to the sentence of each individual defendant.
>>
>> When you do so, you must analyze what the evidence shows with respect to that individual, leaving out of

> consideration entirely any evidence admitted solely against the other defendant.
>
> Each defendant is entitled to have his sentence determined from his own acts, statements and other evidence in the case, which may be applicable to him.

Id. at 263–64. The Court of Criminal Appeals, citing Richardson v. Marsh, invoked the presumption that the jury understood and followed the trial court's instructions, and found

> nothing in the record that suggests that the jury was unable to weigh the evidence separately, separate the aggravating and mitigating circumstances applicable to each defendant, consider and weigh them, and render the individualized decision required. The evidence as to each defendant and the issues in the case were not complicated, were straightforward, and obviously were easily understandable.

Id. at 264. The court therefore rejected the argument that the joint penalty phase proceeding denied Hardy his Eighth Amendment right to individualized sentencing.

In part II of his habeas petition to the District Court, Hardy stated the claim he presented in his brief to the Alabama Court of Criminal Appeals in this language: "II: Joinder of Petitioner's Sentencing Trial with his Codefendant's violated his Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." Petition for Writ of Habeas Corpus at 9, Hardy v. Allen, No. 5:07-cv-1222-IPJ-RRA (N.D. Ala. Jun. 28, 2007). The only reference

28

in part II to these amendments is in this heading.[17]  <u>Lockett v. Ohio</u> is the only

[17]  The following replicates part II of Hardy's habeas petition verbatim:

Petitioner's penalty phase trial was consolidated with Mr. Sneed's.  Both Petitioner and Mr. Sneed repeatedly moved to sever their capital trials, but the trial court denied these requests.  Because Petitioner's death sentence rests on a consolidated penalty phase trial at which the jury was told to consider penalty phase and guilt phase evidence that applied only to Mr. Sneed, Petitioner's own sentencing determination was unreliable.  The joint penalty phase procedure and sentencing used in this case violated Petitioner's constitutionally guaranteed rights to due process, a fair trial and a reliable sentence under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Capital sentences must be individualized.  In <u>Lockett v. Ohio</u>, 438 U.S. 586,604 (1978), the United States Supreme Court held that a capital defendant is constitutionally entitled to present to the jury evidence of "any aspect of [his] character or record and any circumstances of the offense that [he] proffers as a basis for a sentence less than death."  The Supreme Court has stated that this mandate that a death sentence be individualized renders inadmissible at the penalty phase evidence which does not bear on the capital defendant's "personal responsibility and moral guilt."  <u>Enmund v. Florida</u>, 458 U.S. 782, 801 (1982). See also <u>Zant v. Stephens</u>, 462 U.S. 862 (1983) and <u>Lewis v. State</u>, 380 So.2d 970, 979 (Ala. Crim. App. 1979).

At the penalty phase in this case, the trial court allowed the jury to consider evidence from the guilt phase.  The guilt phase evidence presented against the co-defendant would have been inadmissible against Mr. Hardy, had they had separate trials.  However, at this penalty phase, guilt phase evidence relevant only to Mr. Sneed was admitted while the jury considered the Petitioner's sentence. Mr. Sneed's oral statements to the police would not have been part of the Petitioner's conviction or sentencing determination had they had separate trials.  However, Petitioner's sentence was rendered after evidence regarding Ulysses Sneed's culpability and further prejudicial evidence solicited by Mr. Sneed's attorneys were admitted.

The trial court attempted to address this concern at the penalty phase by instructing the jury that it should not consider evidence admitted against the co-defendant.  The risk of prejudice, however, was too great to be alleviated with a jury instruction.  The jury was being asked to parse out the aggravating and mitigating evidence in Petitioner's case although that evidence was not separated when it was presented to them.  The State relied on its case at the guilt phase. Petitioner renewed his objection to that evidence.

United States Supreme Court holding part II cites in support of his claim that he

was denied an individualized sentencing phase procedure.[18]

The State's response to this claim, as quoted in the District Court's order

denying Hardy's petition, was that Hardy had not shown that the Court of

<hr />

The jurors were instructed to consider each defendant as an individual. But the jurors were not told to clear their minds of all of the prejudicial evidence introduced by and against Mr. Sneed at the guilt stage when considering the appropriate sentence for Petitioner.

Petitioner's penalty phase jury recommended by a 10-2 vote that he be executed. The vote in this case belies any claim of harmless error. It was likely that a proper sentencing proceeding at which the jury considered only evidence applicable to Mr. Hardy would have changed the vote of at least one juror. See, Mills v. Maryland, 486 U.S. 367 (1988) (constitutional violation if even a single juror is precluded from considering mitigating circumstances).

Because Petitioner was entitled to that determination being based solely on his acts, character and background, this Court must remand grant Petitioner's habeas corpus petition.

Petition for Writ of Habeas Corpus at 10–12, Hardy v. Allen, No. 5:07-cv-1222-IPJ-RRA (N.D. Ala. Jun. 28, 2007).

[18] Hardy also cited three other Supreme Court decisions, supra note 17, but their holdings do not aid his claim given our consideration of Lockett. See Mills v. Maryland 486 U.S. 367, 384, 108 S. Ct. 1860, 1870, 100 L. Ed. 2d 384 (1988) (remanding a death penalty determination for resentencing when there was "a substantial probability that reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."); Zant v. Stephens, 462 U.S. 862, 864, 103 S. Ct. 2733, 2736, 77 L. Ed. 2d 235 (1983) (rejecting defendant's claim that his "death penalty must be vacated because one of the three statutory aggravating circumstances found by the jury was subsequently held to be invalid . . ., although the other two aggravating circumstances were specifically upheld."); Enmund v. Florida, 458 U.S. 782, 801, 102 S.Ct. 3368, 3379, 73 L. Ed. 2d. 1140 (1982) (reversing "the Florida Supreme Court [for] affirm[ing] the death penalty . . . in the absence of proof that [the defendant] . . . intended or contemplated that life would be taken.").

Criminal Appeals's denial of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Hardy v. Allen, No. 5:07-cv-1222-IPJ-RRA, slip op. at 37 (N.D. Ala. Sept. 21, 2010) (citations omitted) (internal quotation marks omitted). The State was correct; Hardy made no such showing. All Hardy could say, as the District Court quoted him, was "that § 2254(d) does not apply here because the 'state courts decided Mr. Hardy's claim based on state law.'" Id. (quoting Petitioner's Brief on the Merits and Request for Evidentiary Hearing at 21, Hardy v. Allen, No. 5:07-cv-1222-IPJ-RRA (N.D. Ala. Mar. 19, 2008). He therefore contended that the District Court should consider the merits of the claim de novo. Id.

The District Court denied the part II claim because Hardy had not shown, and could not show, that the Court of Criminal Appeals decision was "contrary to, or an unreasonable application of, clearly established federal law, or that it was an unreasonable interpretation of the facts in light of the evidence before the court." Hardy v. Allen, No. 5:07-cv-1222-IPJ-RRA, slip op. at 40 (N.D. Ala. Sept. 21, 2010).

31

In his brief to this court, Hardy frames his claim in these words: "Antagonistic defenses at the penalty-phase prevented the jury from making a reliable judgment about the penalty, denied Mr. Hardy's Sixth Amendment right to confront witnesses against him, and denied him due process. Combined, these constitutional violations deprived him of individualized sentencing in violation of the Eighth Amendment to the United States Constitution."

Brief of Appellant at 22, Hardy v. Allen, No. 11-10240 (11th Cir. Mar. 7, 2011). Hardy contends that the Alabama Court of Criminal Appeals ignored his claims under the Confrontation and Due Process Clauses, and that the District Court did likewise; therefore, we should vacate the District Court's disposition of those claims, and review them de novo or remand the claims to the District Court for de novo review.

We reject Hardy's argument and his request for several reasons. First, he failed to exhaust his denial of confrontation and due process claims in the Alabama courts and has not shown cause, and resulting prejudice, for failing to do so. See 28 U.S.C. § 2254(b)–(c). Second, and alternatively, because he did not

32

present those two claims to the District Court,[19] we will not entertain them in the first instance. See Hill v. Jones, 81 F.3d 1015, 1020 (11th Cir. 1996) ("As a general rule, we will not entertain issues or arguments on appeal that were not fairly presented to the district court."). Third, he failed to argue in the District Court that the Alabama Court of Criminal Appeals' decision—denying his claim that he did not receive individualized sentencing as required by Lockett v. Ohio—was deficient for the reasons set out in AEDPA, see 28 U.S.C. § 2254(d)(1)–(2); and fourth, assuming that he made the argument, it fails because the Court of Criminal Appeals decision properly applied Lockett.

For the foregoing reasons, we affirm the District Court's resolution of the second issue designated in the COA.

C.

We now discuss whether the Alabama appellate court's conclusions that Hardy's right against self-incrimination was not violated by the prosecutor's comments was an unreasonable application of clearly established federal law.

---

[19] See supra note 15. Regarding his Confrontation Clause claim, it was not until he wrote his opening brief to this court that he cited a Supreme Court holding dealing with the Confrontation Clause, to wit, Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

33

Hardy claims that Sergeant Dwight Hale of the Decatur Police Department, while testifying as a witness for the State in the guilt phase of the trial, commented on Hardy's silence after he had been read his <u>Miranda</u> warnings following his arrest in Kentucky.[20]  The Alabama Court of Criminal Appeals described the claim as Hardy stated it in his brief to the court, then recounted the events that gave rise to the claim.

> Hardy contends that "the trial court erred by allowing a state witness to impermissibly comment on [his] post-<u>Miranda</u> silence." Shortly after Hardy was arrested in Kentucky, he was advised of his <u>Miranda</u> rights by Sergeant Dwight Hale of the Decatur Police Department.  He signed a form acknowledging that he understood those rights, he waived them, and he agreed to give a statement.  He was questioned by Hale and Sergeant John Boyd, also of the Decatur Police Department.  That statement was not recorded; however, Hale made notes of what Hardy said.
>
> In his statement, Hardy denied involvement in the crime, but made certain damaging admissions that implicated him in it.  Hale testified for the state, relating the substance of Hardy's statement. Hardy bases his contention that Hale impermissibly commented on his post-Miranda silence on the following testimony:
>
> > A. [HALE]: . . . [W]e told [Hardy] that we had also found a cash register that had been recovered just a short distance from

---

[20]  See <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  This right against self-incrimination is applicable to the States through the Due Process Clause of the Fourteenth Amendment.  See <u>Malloy v. Hogan</u>, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492, 12 L. Ed. 2d 653 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.").

where he lived, and that some fingerprints had been lifted off of those items that were recovered. He was still crying, denying any involvement in anything.

Then he was told that we knew he was involved, you could see him on the videotape, there was no denying it, and that if he had any kind of evidence to prove that he was not involved in anything, was not in Decatur on that night, that if he would tell us about it we would do our best to investigate it and follow up and make it known to everyone.

Again, we told him about the tape. We told him that the vehicle, you could see Hines's vehicle at one section of the tape and it looks like a '78 Ford as it drove in front of the doors on the tape.

Q. [PROSECUTOR]: Back up just a second, Dwight. What was his response when you told him if he had anything you could check out or investigate to indicate that he was not guilty?

[HARDY'S COUNSEL]: We object to that. That violates our client's right of the Fifth Amendment.

THE COURT: Sustained.

Hardy v. State, 804 So. 2d 247, 264–65 (Ala. Crim. App. 1999) (alterations in original) (footnote omitted) (quoting Brief of Appellant at 27, Hardy v. State, 804 So. 2d 247 (No. 95-0589)). After the court sustained the objection,[21] the prosecutor's direct-examination of Hale continued during which Hale related that Hardy admitted that he tried to get the cash register "open." When Hale asked him

_____

[21] Since Hardy's counsel did not want the court to give the jury a cautionary instruction, the court did not give one. However, the court did admonish the jury on several occasions during the trial not to treat counsel's statements as evidence.

what happened to the "gun and clothes," Hardy said that "the gun was wrapped in plastic and he hid it in the attic in his father's house in Tanner. He said the clothes were burned in the backyard at his father's house." Id. at 265. As for the cash register, "he said it was thrown away." Id.

Later in the day, after the jury had been excused for the night, Hardy moved for a mistrial, and this exchange took place.

> [HARDY'S COUNSEL]: We would move for a mistrial on the following grounds. The District Attorney phrased one of his questions earlier today in such a manner that was tantamount to a comment of the defendant. . . .
> . . . .
>
> [HARDY'S COUNSEL]: Failure to deny something. . . . We're not going to ask for a cautionary instruction. We'll just ask for a mistrial. We think the cure would be worse than the—
>
> THE COURT: I agree. As I recall the question, it was in the course of the discussion between Mr. Hardy [and] Lieutenant Hale, and he was just reciting what was stated at the time right there when they were in Louisville. Do you know of anything—the objection was sustained.

Hardy v. State, 804 So. 2d at 266 (alterations in original).

On direct appeal to the Alabama Court of Criminal Appeals and Alabama Supreme Court, Hardy argued that Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), required the trial court to grant his motion for mistrial. Doyle held that the prosecution's "use for impeachment purposes of [the defendant's]

36

silence, at the time of arrest and after receiving Miranda warnings, violated the

Due Process Clause of the Fourteenth Amendment." Id. at 619, 96 S. Ct. at 2245.

Hardy claimed that when Hale and Sergeant Boyd were questioning him in

Kentucky, he invoked his right to stop the interrogation, his right to silence, the

moment Hale asked him if he had any evidence that would prove that he was not

involved in the murder. Hardy further claimed that the question the prosecutor put

to Hale on the witness stand—"[w]hat was his response when you told him if he

had anything you could check out or investigate to indicate that he was not

guilty?," Hardy v. State, 804 So. 2d at 265 (internal quotation marks

omitted)—called for the answer that Hardy said nothing and invoked his right to

silence. The Court of Criminal Appeals disagreed. It held that up to the time the

question was asked,

> it appears from the record that Hardy had waived his Miranda rights, had agreed to talk to the officers, and appeared to be fully cooperating. There is nothing in the record to suggest that he ever contemplated electing to remain silent or deciding that he wanted to stop answering questions. Did Hardy invoke his right to silence when he was asked if there was anything the officers could check out or did he respond in some other way? We do not know; certainly the jury did not know. We agree with the state—nothing was presented from which it could be inferred that Hardy had elected to remain silent or invoked his right to do so. The record is devoid of anything that indicates silence on Hardy's part.

Hardy v. State, 804 So. 2d at 267.

37

In prosecuting his petition for habeas relief in the District Court, Hardy argued that the Court of Criminal Appeals's decision rejecting his claim amounted to an unreasonable application of the Supreme Court's holding in Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). As the District Court concluded, Griffin is inapposite.[22]

The question before the District Court therefore was whether the Court of Criminal Appeals unreasonably applied Doyle. The District Court concluded that it did not.

> First, there is nothing in the record to suggest that Hardy ever invoked his right to remain silent. In fact, Hardy signed a waiver of his Miranda rights, then made a statement to Decatur Police Officers Hale and Boyd in which he made admissions implicating him in the crime. Furthermore, the testimony of Sergeant Hale concerning Hardy's statement did not implicate Doyle, since Sergeant Hale said nothing to indicate that Hardy was in fact silent when asked if he had

---

[22] In Griffin, the defendant was convicted of murder. He did not testify in the guilt phase of the case, but took the stand in the penalty phase. The trial court instructed the jury on the issue of guilt, stating that a defendant has a constitutional right not to testify. But it told the jury:

> As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable.

Griffin v. California, 380 U.S. 609, 610, 85 S. Ct. 1229, 1230, 14 L. Ed. 2d 106 (1965). Hardy's case did not involve a comment on his refusal to testify at trial.

any kind of evidence to prove that he was not involved in the crime. Clearly, the state court's rejection of this claim did not involve an unreasonable application of <u>Doyle</u> and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

<u>Hardy v. Allen</u>, No. 5:07-cv-1222-IPJ-RRA, slip op. at 52–53 (N.D. Ala. Sept. 21, 2010).

In his brief to this court on appeal, Hardy argues that the District Court, like the Court of Criminal Appeals beforehand, misapplied the Supreme Court's holding in <u>Doyle</u>. We are not persuaded.

For these courts to have misapplied <u>Doyle</u>, it must appear from the record that Hardy invoked his right to cease the interrogation and to stand silent the moment Hale asked him if he had any evidence that could prove that he was not involved in the murder. Whether Hardy did so is a factual issue. Hardy is arguing that the Court of Criminal Appeals' decision that he did not invoke his right to cease the interrogation and stand silent was a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[23]

---

[23] Hardy's brief does not explicitly advance this argument in the § 2254(d)(2) context, but we treat his brief as having done so.

The decision comprises findings of fact—what Hardy said to Hale and Boyd and vice versa that might indicate whether Hardy wanted to stop the interrogation—and a conclusion of law—the legal effect of the facts. The Court of Criminal Appeals's findings of fact—that "nothing was presented from which it could be inferred that Hardy had elected to remain silent or invoked his right to do so. The record is devoid of anything that indicates silence on Hardy's part," Hardy v. State, 804 So. 2d at 267—is a finding that Hardy never explicitly invoked his right to silence. The finding is presumptively correct. See Wood v. Allen, 558 U.S. ___, ___, 130 S. Ct. 841, 845, 175 L. Ed. 2d 738 (2010) ("Under § 2254(e)(1), 'a determination of a factual issue made by a State court shall be presumed to be correct,' and the petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'"). Moreover, it is supported by the fact that Hardy did not appeal the trial court's denial of his motion to suppress on constitutional grounds his statements to Hale and Boyd;[24] nor did he object to the statements when admitted into evidence through Hale's testimony, or challenge the constitutional admissibility of the evidence on direct appeal. Finally, it is clear that after he supposedly invoked his right to stop the

---

[24] Hardy moved the trial court pretrial to suppress the statements on the ground that he had not knowingly and voluntarily waived his right to silence, i.e., that his statements were involuntary. The court heard his motion during a trial recess and summarily denied it.

interrogation and stand silent, Hardy continued to answer the officers' questions. The interrogation stopped, according to Hale, when "'he wanted to think about it and pray about it and talk to me again later. At that time we ended the interview and he was taken over to the Jefferson County Correctional Center.'" Hardy v. State, 804 So. 2d at 265–66.

For the reasons state above, we affirm the District Court's resolution of the third issue designated in the COA.[25]

AFFIRMED.

---

[25] Hardy also moved the District Court pursuant to Fed. R. Civ. P. 60(b) to "set aside its previous judgment, order the State to file a copy of the videotape of the crime that was introduced at trial, make the videotape part of the record of this case, and review [his] claims in light of an independent review of the videotape." This motion, which the District Court denied, is frivolous and warrants no further discussion.